UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| WEIS TOWERS LLC, CELLCO PARTNERSHIP d/b/a VERIZON WIRELESS, and INLAND CELLULAR LLC, | Case No. 2:24-cv-00375-BLW **MEMORANDUM DECISION AND ORDER** |
| Plaintiffs, | |
| v. | |
| KOOTENAI COUNTY, IDAHO; BOARD OF KOOTENAI COUNTY COMMISSIONERS; and LESLIE DUNCAN, BRUCE MATTARE and BILL BROOKS, each in his/her official capacity as a Commissioner of the Board of Kootenai County Commissioners, | |
| Defendants. | |

## INTRODUCTION

Plaintiffs Weis Tower LLC, Cellco Partnership d/b/a Verizon Wireless, and

Inland Cellular LLC brought this lawsuit against Kootenai County, Idaho; Board of

Kootenai County Commissioners; and Leslie Duncan, Bruce Mattare, and Bill

Brooks, each in his or her official capacity as a Commissioner of the Board of

Kootenai County Commissioners. In their suit, the Wireless Companies challenged

the County's denial of their application to construct and operate a 150-foot

wireless communication tower. They allege this denial violated the

Telecommunications Act, which is located at 47 U.S.C. § 332(c)(7).

The Wireless Companies filed a motion for summary judgment and the

County filed a cross-motion for summary judgment. The Court heard oral

argument on both motions. As explained below, the Court grants the Wireless

Companies' summary judgment motion because there is no genuine question of

material fact that the County's denial of the Wireless Companies' application

violated the Telecommunications Act. The Court denies the County's cross-motion

for summary judgment.

## BACKGROUND

### 1. Factual Background

Weis constructs, owns, and manages cell towers and leases them to personal

wireless service carriers, such as Verizon and Inland Cellular. These carriers, in

turn, provide wireless voice, data, and broadband internet services to consumers in

the Western United States.

### A. The Wireless Carriers' Identification of a Gap in Wireless Coverage

Where carriers are unable to provide reliable "in-building" or "in-vehicle"

service, this creates a wireless coverage gap. The existence of such a gap can be

identified and confirmed by certain tests, such as radio frequency propagation modeling and drive tests. Here, Verizon and Inland Cellular claim that there is a gap in each company's respective wireless service coverage along a roughly twelve-mile stretch of the I-90 highway located near Coeur d'Alene—the most populous city in North Idaho.[1] *Weis Decl.* ¶ 7, Dkt. 31-7 at 3; Dkt. 32-17 at 76. Verizon identified this gap in its coverage through modeling and drive tests. Dkt. 32-30 at 83. Inland, on the other hand, is new to the market, so it has yet to provide any coverage in the area. *Weis Decl.* ¶ 6, Dkt 31-7 at 3; Dkt. 32-19 at 27. The Wireless Companies—Weis, Verizon, and Inland—intend for the proposed tower to address a portion of this coverage gap.

**B.    The Wireless Companies' Search for Feasible Sites to Fill the Coverage Gap**

After identifying a service gap, radio frequency engineers frequently create a search "ring" in which a new tower must be located to remedy the gap. *Turner Decl.* ¶ 5, Dkt. 31-6 at 3. Here, however, the Wireless Companies determined that the gap was situated in a mountainous and heavily forested area, so they limited their search for potential locations and carried out that search with the

---

[1] Verizon and Inland each provide personal wireless service using radio frequencies licensed by the Federal Communications Commission.

understanding that more than one tower would be needed to address the entire gap. *Deen Decl.* ¶ 5, Dkt. 31-11 at 2; *Conroy Rpt.* ¶ 45, Dkt. 31-8 at 22. The location needed to meet several legal and practical requirements, as well. For instance, it had to lie within an area zoned to allow cell towers and be large enough to accommodate setback requirements. *Weis Decl.* ¶ 10, Dkt. 31-7 at 4. It also needed to be relatively flat and able to support construction equipment, be near fiber optic lines and electricity, have public road access, and have an owner willing to lease it. *Weis Decl.* ¶¶ 9-10, Dkt. 31-7 at 4. The location also had to be technologically capable of addressing the Wireless Companies' service needs. It thus had to be close to and provide line-of-sight access to the gap area to allow a wireless signal of enough strength, coverage, and capacity to reach its intended target. *Conroy Rpt.* ¶ 44, Dkt. 31-8 at 22.

In surveying the land around the gap area, the Wireless Companies learned that some of it consisted of privately owned properties, but the majority was owned by the U.S. Forest Service. *Turner Decl.* ¶ 6, Dkt. 31-6 at 3. Within the Forest Service's land was an existing facility, known as the American Tower Company tower. *See Turner Decl.* ¶¶ 8-9, Dkt. 31-6 at 4. The Wireless Companies considered using this tower but rejected it as a viable option after determining that it would not provide sufficient signal strength to address the gap. *Turner Decl.*

¶¶ 9-10, Dkt. 31-6 at 4; *Conroy Rpt.* ¶¶ 53-55, Dkt. 31-8 at 24-25; Dkt. 32-17 at 75-79; Dkt. 32-18 at 5, 9, 11.

Verizon also separately considered a potential location on property owned by Stimpson Lumber. *Deen Decl.* ¶¶ 6-7, Dkt. 31-11 at 2-3. The Wireless Companies discovered that this location was surrounded by Forest Service property, so access would require approval from the Forest Service. *Deen Decl.* ¶¶ 6-7, Dkt. 31-11 at 3. They ultimately determined this location was not technologically feasible to remedy the significant gap in Verizon's service or practically available due to the lack of access and challenges associated with obtaining approvals to use the land from the Forest Service. *Deen Decl.* ¶¶ 6-7, Dkt. 31-11 at 2-3.

The Wireless Companies later contacted the Forest Service and asked to use one of their properties to construct a tower. *Turner Decl.* ¶ 8-10, Dkt. 31-6 at 4, 8-12. The Forest Service responded that it had already allowed the American Tower Company's tower to be built on its property and that it would not consider leasing additional space unless "[a]ll other avenues" were "exhausted." *Turner Decl.* ¶ 9-10, Dkt. 31-6 at 4, 8-12.

The Wireless Companies also reached out to the owners of several private properties about leasing a portion of land for the tower. *Weis Decl.* ¶ 11, Dkt. 31-7 at 4. Only one agreed. *Weis Decl.* ¶ 11, Dkt. 31-7 at 4. This location was heavily

wooded with mature trees, elevation changes, and sloping ground. *Weis Decl.* ¶ 12, Dkt. 31-7 at 4; Dkt. 32-18 at 22-28; Dkt. 32-17 at 15, 17, 68-88. The Wireless Companies determined that this location was well-suited to their coverage objectives as it was adjacent to I-90 and had the necessary line-of-site coverage to that highway, despite the terrain. *Weis Decl.* ¶ 12, Dkt. 31-7 at 4. The Wireless Companies proposed to build the tower there.

### C.    The Wireless Companies' Application for a Conditional Use Permit

After settling on a proposed location, the Wireless Companies applied with Kootenai County for a Conditional Use Permit to build and install a cell tower there. Dkt. 32-17 at 15; *Ans.* ¶ XVII, Dkt. 22 at 4. With its application, the Wireless Companies submitted the materials required by the County's code, including site photos, maps, and engineering drawings showing that the tower would comply with the County's zoning regulations. Along with these materials, the Wireless Companies added a site survey, radio frequency analysis, a narrative describing the need for the proposed tower, and information regarding alternative sites. *Compl.* ¶¶ 30-42, Dkt. 1 at 8-13; *Ans.* ¶ XVII, Dkt. 22 at 4. They also obtained the required approvals from various County agencies, including the Kootenai County Fire and Rescue District, and included those approvals with their application. Dkt. 32-19 at 17; Dkt. 32-22 at 129.

Several months later, the Kootenai County Department of Community Development held a public hearing on the application in front of a Hearing Examiner. At the hearing, the Wireless Companies presented evidence and testimony supporting their application. *Compl.* ¶¶ 46-47, Dkt. 1 at 14; *Ans.* ¶¶ XX-XXI, Dkt. 22 at 4-5; Dkt. 32-16 at 10-18; Dkt. 32-30 at 23. They specifically addressed the lack of reliable wireless coverage in the gap area as well as their compliance in submitting the application with the County's code and the County's approval standards for the permit. Dkt. 32-16 at 10, 13; Dkt. 32-30 at 82-83. The Hearing Examiner found that the proposed tower met the requirements in the County's code for the permit and concluded that the application should be approved. Dkt. 32-30 at 2-20.

### D.   Hearing Before the Board of County Commissioners

After the Hearing Examiner reached his conclusion, a County resident opposed to the proposed tower requested a public hearing before the Board of County Commissioners. Dkt. 32-34 at 2. At this hearing, the Board was presented with written evidence, including the Hearing Examiner's recommendation and several statements from individuals opposed to the proposed tower. Dkt. 32-34 at 6; *see, e.g.*, Dkt. 32-27 at 3, 9, 20-23, 25-41. The Board also received testimony

from representatives of the Wireless Companies and members of the public. *See, e.g.*, Dkt. 32-16 at 62-70.

The Wireless Companies' representatives testified and submitted evidence about the existence of a wireless service gap. *See, e.g.*, Dkt. 32-16 at 62-70. They further testified that the application and proposed facility complied with the County's code. Dkt. 32-16 at 62-70.

Many members of the public expressed opposition to the proposed tower without explanation or because they were generally opposed to such towers. *See, e.g.*, Dkt. 32-16 at 83. Others complained of the effect of radio frequency waves on human health. *See, e.g.*, Dkt. 32-16 at 81-89; Dkt. 32-37 at 71-80. Still others raised concerns about the tower's aesthetic impact and the effect it would have on community members' rural lifestyle. *See, e.g.,* Dkt. 32-16 at 80-88; Dkt. 32-37 at 65. Commenters also expressed worry about the risk of fire posed by the proposed tower and its potential to reduce nearby property values. *See, e.g.*, Dkt. 32-16 at 72-73, 76-77, 85; Dkt. 32-37 at 56-59, 61-62, 66, 71.

In rebuttal, the Wireless Companies testified that no county agency had expressed concerns about fire risk or other environmental or health impacts of the proposed tower. Dkt. 32-16 at 8. They also pointed out that there was no specific

evidence showing that the proposed tower would negatively impact surrounding property values. Dkt. 32-16 at 92-93.

As the three Board Commissioners deliberated, one expressed concern about the potential health effects of the proposed tower. Dkt. 32-16 at 109. After the County Attorney advised this Commissioner to revisit her reasoning, she stated that she was opposed to the application because individuals had stated that they did not want it. Dkt. 32-16 at 110. Another commissioner stated that he did not find any support for community opposition to the proposed tower other than anecdotal and subjective assertions, noting specifically that as a former real estate broker, he did not agree with commenters' claims that the proposed tower would cause a significant loss in property values. *Compl.* ¶ 66, Dkt. 1 at 17; *Ans.* ¶ XXV, Dkt. 22 at 6. The Board then denied the application by a vote of 2-1. *Compl.* ¶ 67, Dkt. 1 at 17; *Ans.* ¶ XXV, Dkt. 22 at 6; Dkt. 32-34 at 9-33. The Wireless Companies requested reconsideration of this decision. *Compl.* ¶ 69, Dkt. 1 at 17; *Ans.* ¶ XXV, Dkt. 22 at 6; Dkt. 32-37 at 143-52.

The Board held a hearing to consider the Wireless Companies' reconsideration request. Dkt. 32-22 at 98, Dkt. 32-37 at 160-63. The Wireless Companies' representatives again presented evidence and testimony in support of their application. Dkt. 32-16 at 122-36, 137-39, 163-70; *see* Dkt. 32-37 at 136,

153. And again, opponents expressed general resistance to new wireless technology, testified about the proposed tower's potential effect on property values, mentioned concerns about the health effects of radio frequency emissions, and voiced worry about fire risks associated with the proposed tower. Dkt. 32-16 at 141-62; *see also* Dkt. 32-37 at 141-42. The Board upheld its previous decision denying the application. Dkt. 32-34 at 34-44; Dkt. 32-35 at 1-17.

### E.  The Wireless Companies' Expert's Testing and Conclusions

After the County denied the application, the Wireless Companies retained an expert in radio frequency design, Richard Conroy. *Conroy Rpt.* ¶ 1, Dkt. 31-8 at 8. The Wireless Companies tasked Mr. Conroy with analyzing whether Verizon and Inland had significant gaps in their personal wireless service in the area near the proposed tower site. *Conroy Rpt.* ¶ 3, Dkt. 31-8 at 9. To carry out his task, Mr. Conroy used data collected during Verizon's initial drive tests to produce "drive test maps" showing coverage in the area. *Conroy Rpt.* ¶¶ 20-38, Dkt. 31-8 at 15-20. Mr. Conroy's analysis revealed that Verizon's signal strength decreased below the threshold for in-vehicle service as vehicles traveled east along I-90 from Coeur d'Alene. *Conroy Rpt.* ¶¶ 27-28, Dkt. 31-8 at 17. Based on this data, Mr. Conroy concluded that Verizon had a significant gap in coverage for residences and

vehicles along a twelve-mile span of I-90 east of Coeur d'Alene. *Conroy Rpt.*
¶¶ 28-29, Dkt. 31-8 at 17-18.

Mr. Conroy also analyzed Verizon's service coverage using radio frequency
propagation modeling software. *Conroy Rpt.* ¶¶ 30-32, Dkt. 31-8 at 18. The
software Mr. Conroy used, called "Atoll," allowed him to analyze many different
factors impacting signal strength in the area, such as the height, gain, and
orientation of antennas and features of the terrain. *Conroy Rpt.* ¶¶ 30-32, Dkt. 31-8
at 18. According to Mr. Conroy, the Atoll coverage maps confirmed that Verizon
lacked in-vehicle coverage for more than twelve miles along I-90. *Conroy Rpt.*
¶¶ 35-38, Dkt. 31-8 at 19-20. He also confirmed that Inland did not have any
coverage in this same area. *Weis Decl.* ¶ 6, Dkt. 31-7 at 3; *Conroy Rpt.* ¶¶ 17-18,
Dkt. 31-8 at 14-15. The County did not designate an expert to respond to
Mr. Conroy. *Leonard Decl.* ¶¶ 3-4, Dkt. 31-10 at 3.

## 2.    Procedural Background

After the County denied their application, the Wireless Companies filed this
lawsuit seeking declaratory and injunctive relief. In their complaint, the Wireless
Companies allege two causes of action under the Telecommunications Act: (1) that
the County's denial was not supported by substantial evidence, and (2) that the

County's denial constituted an effective prohibition of personal wireless service. *Compl.* ¶¶ 85-109, Dkt. 1 at 19-24; *see* 47 U.S.C. § 332(c)(7)(B)(i)(II), (iii).

## LEGAL STANDARD

Summary judgment is proper where the pleadings, discovery, and affidavits show there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). There must be a genuine dispute as to a *material* fact—a fact "that may affect the outcome of the case." *Id.* at 248.

One of the principal purposes of summary judgment "is to isolate and dispose of factually unsupported claims . . . ." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). It is "not a disfavored procedural shortcut," but is instead the "principal tool[ ] by which factually insufficient claims or defenses [can] be isolated and prevented from going to trial with the attendant unwarranted consumption of public and private resources." *Id*. at 327.

The trial court's role at summary judgment is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Zetwick v. Cnty. of Yolo*, 850 F.3d 436, 441 (9th Cir. 2017). At the

summary judgment stage, the trial court must view the evidence in the light most favorable to the nonmoving party. If evidence produced by the moving party conflicts with evidence produced by the nonmoving party, the court must assume the truth of the evidence set forth by the nonmoving party with respect to that fact. *Leslie v. Grupo ICA*, 198 F.3d 1152, 1158 (9th Cir. 1999). On the other hand, the Court is not required to adopt unreasonable inferences from circumstantial evidence. *McLaughlin v. Liu*, 849 F.2d 1205, 1208 (9th Cir. 1988). The trial court must enter summary judgment if a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322.

To carry this burden, the moving party need not introduce any affirmative evidence (such as affidavits or deposition excerpts) but may simply point out the absence of evidence to support the nonmoving party's case. *Fairbank v. Wunderman Cato Johnson,* 212 F.3d 528, 532 (9th Cir.2000). This shifts the burden to the nonmoving party to produce evidence sufficient to support a jury verdict in her favor. *Deveraux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001). The nonmoving party must go beyond the pleadings and show "by her [ ] affidavits, or by the depositions, answers to interrogatories, or admissions on file" that a genuine dispute of material fact exists. *Celotex,* 477 U.S. at 324.

However, the Court is "not required to comb through the record to find some reason to deny a motion for summary judgment." *Carmen v. San Francisco Unified Sch. Dist.,* 237 F.3d 1026, 1029 (9th Cir. 2001) (quotation omitted). Instead, the "party opposing summary judgment must direct [the Court's] attention to specific triable facts." *Southern California Gas Co. v. City of Santa Ana*, 336 F.3d 885, 889 (9th Cir. 2003).

Where parties file cross-motions for summary judgment on the same issue, the court must consider both motions and all evidence submitted by both parties. *Fair Hous. Council of Riverside Cnty., Inc. v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001). Each motion must be considered on its own merits. *Id.* Even if both parties assert no genuine disputes of material fact exist, the court must still review the record and make its own determination. *Id.*

## ANALYSIS

### 1.    The Telecommunications Act

Congress passed the Telecommunications Act to "encourage the rapid deployment of new telecommunications technologies." *Sprint PCS Assets, L.L.C. v. City of Palos Verdes Ests.*, 583 F.3d 716, 721 (9th Cir. 2009) (quoting Pub. L. No. 104-104, 110 Stat. 56). At the same time, Congress was determined "to preserve the authority of State and local governments over zoning and land use

matters." *T-Mobile USA, Inc. v. City of Anacortes*, 572 F.3d 987, 992 (9th Cir. 2009). To balance these competing interests, the Telecommunications Act generally preserves the authority of local governments over zoning decisions regarding the placement and construction of wireless service facilities, "but imposes specific limitations on that authority." *T-Mobile S., LLC v. City of Roswell, Ga.*, 574 U.S. 293, 300 (2015) (internal quotation marks omitted).

This case implicates two of those limitations on the County's authority to regulate the installation of the Wireless Companies' proposed tower. First, the County's denial of the Wireless Companies' application must be "supported by substantial evidence contained in a written record." 47 U.S.C. § 332(c)(7)(B)(iii). Second, the County's denial must not "prohibit or have the effect of prohibiting the provision of personal wireless services." 47 U.S.C. § 332(c)(7)(B)(i)(II).

The substantial evidence requirement under the Telecommunications Act does not create a substantive federal limitation upon local land use regulatory power. *MetroPCS, Inc. v. City & Cnty. of San Francisco*, 400 F.3d 715, 723 (9th Cir. 2005), *abrogated on other grounds by City of Roswell, Ga.*, 574 U.S. 293; *see also* 5 U.S.C. § 706. Rather, it "requires a determination whether the zoning decision at issue is supported by substantial evidence in the context of applicable state and local law." *MetroPCS*, 400 F.3d at 723-24. Therefore, "this Court may

not overturn the [County's] decision on 'substantial evidence' grounds if that decision is authorized by applicable local regulations and supported by a reasonable amount of evidence." *Id*. at 725.

If, on the other hand, the County's decision denying the application fails this substantial evidence test, it is invalid regardless of the Telecommunications Act's substantive federal standards. *City of Anacortes*, 572 F.3d at 993 (citing *MetroPCS*, 400 F.3d at 724). Thus, the Court first considers whether substantial evidence supports the Board's denial of the Wireless Companies' application. *City of Anacortes*, 572 F.3d at 994. If the Court concludes substantial evidence supports the denial under the applicable local laws, it next considers whether the denial effectively prohibits the provision of wireless services in violation of § 332(c). *Id*. Even if the Court determines substantial evidence supports the County's decision, that decision may still constitute an effective prohibition in violation of the Telecommunications Act. *Id*.

## 2.   Substantial Evidence Claim

### A.   Substantial Evidence Standard

To be substantial, evidence must be "more than a scintilla and less than a preponderance," and consist of "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *California RSA No. 4 v. Madera*

*Cnty.*, 332 F. Supp. 2d 1291, 1301 (E.D. Cal. 2003); *see also Am. Tower Corp. v. City of San Diego*, 763 F.3d 1035, 1053 (9th Cir. 2014). To determine if substantial evidence exists, "a court will view the record in its entirety and take account of evidence unfavorable to the agency's decision." *Madera Cnty.*, 332 F. Supp. 2d at 1301; *see also City of San Diego*, 763 F.3d at 1053. Review under the substantial evidence standard is deferential but must be more than a rubber stamp. *See, e.g., Madera Cnty.*, 332 F. Supp. 2d at 1302-03. Courts are thus not bound "to accept as substantial evidence impossible, incredible, unfeasible, or implausible testimony, even if it was not refuted." *Airtouch Cellular v. City of El Cajon*, 83 F. Supp. 2d 1158, 1164 (S.D. Cal. 2000).

As the Wireless Companies seek to overturn the County's decision, they bear the burden of showing that substantial evidence did not support it. *See, e.g., Madera Cnty.*, 332 F. Supp. 2d at 1303 (noting absence of Ninth Circuit authority but accepting plaintiff's concession "the burden should be on the communications company"); *but see Airtouch Cellular*, 83 F. Supp. 2d at 1164 (accepting the parties' stipulation that the city bears the burden of proof).

**B.    The County's Denial Was Not Supported By Substantial Evidence**

To determine whether substantial evidence supports the County's denial of the application, the Court first looks to the County's Land Use and Development

Code, which allows for the construction of wireless towers through a conditional

use permit process. K.C.C.1 §§ 8.2.309, 8.5.132, 8.8.201; 8.9.503. To approve an

application under these provisions, the County must find that the application meets

several requirements.[2] K.C.C. § 8.8.201(c)(1). Here, the County concluded that the

Wireless Companies' application failed to meet two of these requirements: (1) it

did not show that the proposed tower would be compatible with existing homes,

businesses and neighborhoods, and the natural characteristics of the area, and (2) it

did not adequately address site constraints or hazards and adequately mitigate any

---

[2] There are seven requirements:

(a) the applicable procedural requirements have been met;

(b) the proposal complies with the applicable standards for the proposed use without variances, or with such variances as may be approved by the Board;

(c) the proposal is compatible with existing homes, businesses, and neighbourhoods, and with the natural characteristics of the area;

(d) the proposal adequately addresses site constraints or hazards, and adequately mitigates any negative environmental, social, and economic impacts;

(e) the services and facilities for the proposal are available and adequate;

(f) the proposal will meet the duly adopted requirements of other agencies with jurisdiction; and

(g) the proposal is not in conflict with the comprehensive plan.

K.C.C. § 8.8.201(c)(1).

negative environmental, social, and economic impacts. Dkt. 32-35 at 14; Dkt. 32-34 at 30. The question before the Court then is whether substantial evidence supports the reasons the County cited in its decision for denying the application.

The evidence submitted to the County in opposition to the application consisted of public comments, testimony, and documents. A significant amount of that evidence reflected commenters' general opposition to cell towers grounded in concerns about alleged health effects posed by radio frequency emissions. *See, e.g.*, Dkt. 32-16 at 81-86, 88-89, 141-54; Dkt. 32-37 at 71-80. But Congress, through the Telecommunications Act, prohibited local governments from denying applications to construct or install towers like the one at issue here based on concerns about such effects. 47 U.S.C. § 332(c)(7)(B)(iv). Thus, evidence of this type is clearly inadequate to substantiate the County's denial of the Wireless Companies' application. *See Madera Cnty.*, 332 F. Supp. 2d 1292 (E.D. Cal. 2003).

The County appears to acknowledge this insufficiency and points to other evidence that it argues nevertheless constitutes substantial evidence for its denial of the application. Dkt. 34 at 4-6. This evidence consists of concerns about the proposed tower's effect on: (1) the rural way of life in the surrounding community, (2) the aesthetics of the area near the proposed tower, (3) the risk of fire in that

area, and (4) the value of property located near the proposed tower. Dkt. 34 at 5-6. The Court will address each in turn.

### (1) Lifestyle Impact

As for commenters' concern about the proposed tower's impact on their rural way of life, this Court recently determined that expressions of similar sentiments did not constitute substantial evidence. *Intermax Towers, LLC v. Ada County, Idaho*, 2025 WL 1104041 (D. Idaho Apr. 14, 2025). In *Intermax*, the Court flagged several comments from opponents of a proposed tower, including one individual who stated that he moved to the location at issue to enjoy the region's beauty, "not to have a cell phone tower," and another who noted that many people in that region moved there because they did not want a large cell tower nearby. *Id*. at *15-16. The Court in *Intermax* concluded that these types of "not-in-my-backyard" objections did not constitute substantial evidence. *Id*. at *15-16; *see Sprint Spectrum, L.P. v. County of St. Charles*, 2005 WL 1661496, at *6 (E.D. Mo. July 6, 2005) (noting that a "not in my backyard" general objection to placement of a wireless tower did not constitute substantial evidence for denial of tower permit). I agree with Judge Brailsford's conclusion.

Here, the County goes no further than to rely upon similar expressions of concern. Dkt. 34 at 6. For example, one opponent of the proposed tower noted that

she and other community members moved to their region to do without the "so-called conveniences" afforded by cell towers. Dkt. 32-37 at 71; *see* Dkt. 34 at 6. Another noted that gaps in cell service were a part of the Idaho lifestyle. Dkt. 32-16 at 79-80; *see* Dkt. 34 at 6. A third stated that the proposed tower should not be in the "backyard" of nearby properties. Dkt. 32-16 at 145-46. The Court finds, as it did in *Intermax*, that such opposition does not constitute substantial evidence to justify the Board's denial of the permit application to install a cell tower.

Moreover, the comments and testimony the County identifies regarding lifestyle impact come from only a few individuals. Some vocal opponents of the proposed tower provided written and oral statements, and their repeated opinions are cited separately by the County. Dkt. 32-31 at 61, Dkt. 32-37 at 70-71, Dkt. 32-16 at 33, 85, 87; *see* Dkt. 34 at 6. But courts have concluded that "the voicing of negative opinions by a small number of citizens," alone cannot justify a denial. *Iowa Wireless Servs., L.P. v. City of Moline*, 29 F. Supp. 2d 915, 922-23 (C.D. Ill. 1998). In *Iowa Wireless*, the court determined that to conclude otherwise would "completely frustrate the purpose of the statute." *Id*. Similarly, the Sixth Circuit has held that "[g]eneral concerns from a few residents that the tower would be ugly or that a resident would not want it in his backyard are not sufficient." *T-Mobile Central, LLC v. Charter Tp. Of West Bloomfield*, 691 F.3d 794, 800 (6th Cir.

2012). Because the evidence regarding concerns about the proposed tower's impact on the rural community are largely limited to "not-in-my-backyard" opposition from a few community members, it does not constitute substantial evidence justifying the denial.

### (2)  Aesthetic Impact

The County also points to opposition based on concerns about the aesthetic impact of the proposed tower. Dkt. 34 at 5-6. Again, though, the evidence the County cites includes the opinions of only a few individuals repeating their opinions throughout the record and hearing transcript. *See* Dkt. 32-34 at 1, Dkt. 32-37 at 65; Dkt. 32-16 at 24-25, 35, 76, 80, 84-85; Dkt. 34 at 5-6. This alone renders the evidence the County points to inadequate. *See Iowa Wireless*, 29 F. Supp. 2d at 922-23. Furthermore, the cited comments reflect a general opposition to the look of a cell tower, not a concern with the specific location of the proposed tower or any feature of the type of tower proposed. Such "generalized aesthetic concerns" have been deemed insufficient to constitute substantial evidence. *Madera Cnty.*, 332 F. Supp. 2d at 1308-09; *see Cellular Telephone Co. v. Town of Oyster Bay*, 166 F.3d 490, 496 (2d Cir. 1999) ("we find that the few generalized expressions of concern with 'aesthetics' cannot serve as substantial evidence on which the Town could base the denials").

Only two comments appear to mention concerns about the proposed tower's impact on views from specific properties. Dkt. 32-34 at 1, Dkt. 32-37 at 65; Dkt. 32-16 at 76, 84-85. In the first, the commenter speculated that her view "might change" due to the proposed tower. Dkt. 32-16 at 84-85. She noted that she was not certain of the effect the proposed tower would have because she was unaware of the results of the "balloon test." This test, which was conducted by the Wireless Companies, involved raising a balloon to the point where the top of the proposed tower would reach. Dkt. 32-17 at 70, 80-88; *see also* Dkt. 32-16 at 18. The test showed that the proposed tower would be screened and hardly visible from the properties surrounding it due to the heavy tree cover at the proposed site and the elevation changes in the land nearby it. Dkt. 32-17 at 70, 80-88; *see also* Dkt. 32-16 at 18. This commenter's assertion then is not only speculative—because she did not know the results of the balloon test—but it is also undermined by the results of that test. *See West Bloomfield*, 691 F.3d at 800 (finding that evidence relied on by the local government, which was "merely alleged," was not substantiated").

In the second, the commenter indicates that he was also concerned that the proposed tower would negatively impact his scenic view from home. Dkt. 32-34 at 2. He submitted a picture of a wooded landscape next to the same picture but

with the image of a cell tower inserted into it. Dkt. 32-37 at 65. He characterized this as a "crude attempt" to show what the proposed tower might look like from his property. Dkt. 32-16 at 76. In addition to conceding the imprecision of this image, he also failed to note whether his concern was based on the specific location where the proposed tower would be located. Dkt. 32-34 at 2; Dkt. 32-16 at 35, 76. And, like the first commenter, he did not address the balloon test, which demonstrated that the tower would be barely visible from nearby properties. *See* Dkt. 32-34 at 2; Dkt. 32-16 at 35, 76. Finally, even if the Court overlooked these shortcomings, these comments only come from two individuals, and "[g]eneral concerns from a few residents that the tower would be ugly or that a resident would not want it in his backyard are not sufficient" to constitute substantial evidence. *West Bloomfield*, 691 F.3d at 800. Thus, the aesthetic concerns expressed by opponents of the proposed tower are also inadequate to justify denial of the Wireless Companies' application.

### (3)   Fire Risk

Most commenters who addressed the risk of fire concern did no more than say "[i]ncreased fire risk," or something similar. Dkt. 32-29 at 1; *see* Dkt. 32-28 at 8-10; Dkt. 32-31 at 52-53, Dkt. 32-37 at 65; Dkt. 32-16 at 27-28, 31, 160. Some opponents of the proposed tower merely submitted pictures of wireless towers

burning. Dkt. 32-31 at 1-4, Dkt. 32-31 at 40-44, Dkt. 32-37 at 55-58. Once again, these concerns are mere allegations and are "not substantiated," thus, they do not constitute substantial evidence for the permit denial. *West Bloomfield*, 691 F.3d at 800. That these concerns are unsubstantiated is only underscored by the fact that the Kootenai County Fire and Rescue District reviewed the Wireless Companies' application and approved it. Dkt. 32-19 at 17, Dkt. 32-22 at 129; *see Intermax*, 2025 WL 1104041, at *15-17 (referencing cell tower company having received necessary approvals from various agencies before concluding that substantial evidence did not support permit denial).

Granted, a few opponents of the proposed tower identify a more specific concern of fire risk, namely that the proposed tower will cause an increase in lightning strikes near the area and a corresponding increased risk of forest fire. *See* Dkt. 32-27 at 9; Dkt. 32-16 at 20-23, 72-73. But most of these allegations, though more specific than simply stating "increased fire risk," are still only allegations and thus are similarly unsubstantiated. *See West Bloomfield*, 691 F.3d at 800 ("Substantial evidence should be substantiated.").

Only one commenter appeared to offer evidence to support her assertion that the proposed tower would pose an increased risk of fire. She stated that she had evidence to show that lightning strikes are more likely near cell towers and that

fires are more likely in heavily forested areas. Dkt. 32-16 at 20-23. She thus

asserted that the proposed tower would increase fire risk. Dkt. 32-16 at 20-23. But

the study she relied on for her underlying claim that lightning strikes are more

frequent near cell towers does not actually support that claim. In fact, this study

focused on towers and other man-made structures at least 200 meters (656 feet) in

height—more than four times as tall as the proposed tower would be. Dkt. 32-30

at 84-93. Her assertion about increased fire risk is thus also unsubstantiated.

*See West Bloomfield*, 691 F.3d at 800

Moreover, although this commenter voiced an additional concern about

exiting her property in case of a fire given the proximity of her property to the

proposed site, the lack of substantiation for any claimed increased risk of fire in the

first place renders any such concern speculative. Dkt. 32-16 at 20-23. And again,

speculation is inadequate to constitute substantial evidence. *SBA Communications

Inc.,* 164 F.Supp.2d at 291-92 (holding that speculation did not constitute

substantial evidence to support a denial); *Madera Cnty.*, 332 F. Supp. 2d at

1306 (rejecting as substantial evidence fears or concerns that were "objectively

unreasonable, speculative, and not supported by the record"). Thus, the

commenters' allegations about the proposed tower increasing risk of fire do not

constitute substantial evidence to support the permit denial either.

### (4)   Decreased Property Values

The commenters' concerns about the proposed tower decreasing property values are also unsubstantiated, but for different reasons. First, many of the concerns about property values appear tied to worries about the alleged health effects of radio frequency emissions. For instance, one noted that "[c]ell towers are a health hazard and reduce property values," while another quoted a realtor who opined that a nearby cell tower "would affect the sellability of a home because some people believe cell towers omit radiation." Dkt. 32-27 at 20; Dkt. 32-37 at 69; *see also* Dkt. 32-37 at 71; Dkt. 32-16 at 73-77, 85, 160. But as this Court recently noted, the Telecommunications Act bars local governments from denying a permit for a wireless tower because of "*direct or indirect*" concerns about the health effects of radio frequency emissions. *Intermax*, 2025 WL 1104041, at *17.

Second, although some commenters concerned with property values cited surveys and studies or quoted potential property buyers or real estate agents to support their claims, they failed to furnish any information about the reliability of these pieces of evidence. Dkt. 32-31 at 63-69; Dkt. 32-37 at 66; Dkt. 32-16 at 34-35, 147-51. Studies or surveys can, in some instances, constitute substantial evidence, but they must be accompanied by information about the methodology used in them to substantiate the results or opinions offered. *Marlo v. United Parcel*

*Serv., Inc.*, 639 F.3d 942, 949 (9th Cir. 2011). Here, no such methodology was provided.

Moreover, these surveys and studies are unreliable for reasons apart from the lack of methodology. For instance, one article addresses potential decreases in property values without specifying what part of the country the article is referring to: "In some areas with new towers, property values have decreased by up to 20%." Dkt. 32-31 at 64; *see also* Dkt. 32-37 at 61-62. Another article addressed reduced property values in Savannah, Georgia. Dkt. 32-31 at 69. These articles therefore have little, if any value given there is no evidence that the opinions offered are relevant to Kootenai County, Idaho. Besides, these articles also reveal that the findings or opinions offered are contingent on specific facts, such as whether a property is located more or less than 1500 feet from a tower or whether the tower is visible from a specific property. Dkt. 32-31 at 64, 69. But the commenters do not tie these findings to concerns here about specific properties around the proposed tower location.

As for opinions from real estate agents or a few potential property buyers offered anecdotally to support the claim of decreased property values, these sources of evidence are similarly unsubstantiated. Dkt. 32-37 at 63; Dkt. 32-16 at 147-51. They are mere allegations offered without evidentiary support. Dkt. 32-

37 at 63; Dkt. 32-16 at 147-51; *see West Bloomfield*, 691 F.3d at 800 (noting that

mere allegations were not substantiated). And similar evidence—residents' general

concern about decreased home values near a cell tower and an unsupported

affidavit from a real estate broker stating the same—has been found to fall short of

the substantial evidence standard before. *Town of Oyster Bay,* 166 F.3d at 496. The

commenters' concerns about decreased property values caused by the proposed

tower then, as with their other concerns, do not constitute substantial evidence.

Because there is no genuinely disputed question of material fact as to

whether there is substantial evidence to support the County's denial of the

proposed tower application, the Court grants the Wireless Companies' motion for

summary judgment and denies the County's cross-motion for summary judgment.[3]

*See* Fed. R. Civ. P. 56(a).

---

[3] This case is distinguishable from the Court's recent decision in *New Cingular Wireless PCS, LLC v.Kootenai County, Idaho*, where the Court determined that the denial of a similar application was supported by substantial evidence. 2025 WL 563911, at *10-11 (D. Idaho Feb. 20, 2025). Here, unlike in *Kootenai County,* the local Fire District approved the application and the Wireless Companies performed a balloon test demonstrating that the aesthetic impact of the tower would be minimal. Dkt. 32-16 at 18; Dkt. 32-17 at 70, 80-88; Dkt. 32-22 at 129. Moreover, the comments from opponents to the tower in *Kootenai County* expressed more pointed concerns than those presented here. For instance, commenters in *Kootenai County* were worried about the condition of the specific road leading to the proposed site, the possibility for increased vandalism, trespass, and nuisance near the site, and the impact of increased fire insurance premiums—none of which were addressed here. *See Kootenai County*, 2025 WL 563911 at 9.

**MEMORANDUM DECISION AND ORDER - 29**

### 3.    Effective Prohibition Claim

Regardless of whether substantial evidence supports a local government's denial of a conditional use permit under state and local law, that denial may still violate the effective prohibition standard. *City of Anacortes*, 572 F.3d at 997-98. Thus, for the sake of completeness, the Court will consider whether the County's denial effectively prohibited the provision of wireless service.

A wireless service provider can demonstrate that an effective prohibition has occurred by showing that (1) the provider has a significant service gap, and (2) its application proposes to address that gap by the least intrusive means.[4] *MetroPCS*, 400 F.3d at 731. A significant gap in service "exists whenever a provider is prevented from filling a significant gap in its own service coverage." *MetroPCS*, 400 F.3d at 733. The "least intrusive" prong requires the provider to show that "the manner in which it proposes to fill the significant gap in service is the least

---

[4] The Wireless Companies request that the Court apply the "materially inhibits" standard when assessing whether the County's denial of their application constituted an effective prohibition. Dkt. 31-2 at 14-17. That standard was first applied by the Federal Communications Commission in 2018, and it was affirmed by the Ninth Circuit. *Accelerating Wireless Broadband Deployment by Removing Barriers to Infrastructure Investment*, 33 FCC Rcd 9088, ¶ 37 (2018), *aff'd*, *City of Portland v. United States*, 969 F.3d 1020, 1035 (9th Cir. 2020). Because the Court determines that the County's denial constitutes an effective prohibition even under the standard the County's views is more lenient than the "materially inhibits" standard, *see* Dkt. 34 at 8-9, the Court will apply the tradition two-part standard that it recently used in *Kootenai County*, 2025 WL 563911.

intrusive on the values that the denial sought to serve." *Id.* at 734 (quoting *APT Pittsburgh Ltd. P'ship v. Penn Twp.*, 196 F.3d 469, 480 (3d Cir. 1999)). When a provider makes a prima facie showing that the proposed tower is the least intrusive means of filling a significant gap, the government cannot simply reject the provider's evidence. *City of Anacortes*, 572 F.3d at 998. Instead, the government must show that there are potentially available and technologically feasible alternatives. *Id.* A speculative alternative is not a viable alternative. *Id.*

### A.  Significant Gap in Coverage

The first question under the two-part test to determine whether an effective prohibition occurred is whether there is a significant gap in coverage. *MetroPCS*, 400 F.3d at 731. There is a significant gap "whenever a provider is prevented from filling a significant gap in its own service coverage." *City of San Diego*, 763 F.3d at 1056. A "wide range of context-specific factors" is used to assess the significance of alleged coverage gaps. *Palos Verdes Estates*, 583 F.3d at 727. These factors include the effects on significant highways or railways, the nature of the area or number of potential customers, the effects on commercial districts, and safety interests. *Id.* A lack of wireless signal of sufficient strength to provide "in-building" or "in-vehicle" service in an area that consists of more than a few isolated pockets of inadequate coverage suffices to show a significant gap exists.

MEMORANDUM DECISION AND ORDER - 31

*See MetroPCS Inc. v. City & Cty of San Francisco*, 2006 WL 1699580, at *11

(N.D. Cal. June 16, 2006), on remand from 400 F.3d 715 (9th Cir. 2005) ("[W]here

coverage holes are large or frequent in number and size, and extend to the interior

of buildings in urban areas or to a significant number of residences in well-

populated areas, such coverage holes are actionable under the [Communications

Act]." This showing can be established with propagation maps, drive tests, or both.

*See, e.g., T-Mobile West, Corp. v. City of Agoura Hills*, 2010 WL 5313398, *8

(C.D. Cal. Dec. 20, 2010).

The Wireless Companies here provided an expert report from Mr. Conroy, a

radio frequency design specialist, who opined that the evidence showed that there

was a gap in Verizon's personal wireless coverage alone a twelve-mile stretch of I-

90 east of Coeur d'Alene.[5] *Conroy Rpt.*, Dkt. 31-8. In arriving at his opinion, Mr.

---

[5] The Court can consider evidence outside the administrative record when evaluating an effective prohibition claim. *Kootenai County*, 2025 WL 563911, at *10-11. Unlike the substantial evidence analysis, "[c]ourts uniformly hold that effective prohibition claims ... 'present questions that a federal district court determines in the first instance without any deference to the [local zoning] board.'" *AT&T Mobility Servs., LLC v. Vill. of Corrales*, 80 F. Supp. 3d 1267, 1269 (D.N.M. 2014) (quoting *Nat'l Tower, LLC v. Plainville Zoning Bd. of Appeals*, 297 F.3d 14, 22 (1st Cir. 2002) (collecting cases)). Although the Ninth Circuit has never squarely addressed whether to consider evidence outside the administrative record in deciding an effective prohibition claim, those courts that have addressed the issue held "outside evidence may be essential" to deciding such claims. *Town of Amherst, N.H. v. Omnipoint Commc'ns Enterprises, Inc.*, 173 F.3d 9, 16 n.7 (1st Cir. 1999); *see also Green Mountain Realty Corp. v. Leonard*, 688 F.3d 40, 49 (1st Cir. 2012); *VoiceStream Minn., Inc. v. St. Croix Cnty.*, (Continued)

---

Conroy reviewed drive test data and created propagation maps. *Conroy Rpt.* ¶¶ 20-
38, Dkt. 31-8 at 15-20. Such data and maps have been repeatedly accepted as
evidence of a gap in wireless service by other courts. *See, e.g.*, *AT&T Mobility
Services, LLC v. Village of Corrales*, 642 F. App'x 886, 891 n.3 (10th Cir. 2016).
What is more, the evidence shows that this coverage gap on a twelve-mile stretch
of I-90 is highly trafficked, with approximately 15,000 vehicles per day using it,
and that it connects to North Idaho's most populous city, Coeur d'Alene. Dkt. 32-
18 at 13, 21; *Conroy Rpt.* ¶ 29 n.9; Dkt. 31-8 at 18; *see, e.g., Corrales*, 642 F.
App'x. at 890-91 (finding a significant gap where in-vehicle service was unreliable
only over a 2-mile stretch of the village's "main road"); *Agoura Hills*, 2010 WL
5313398, at *8 (finding a "four-lane 'primary arterial' that bears nearly 15,000
vehicles per day, including three bus lines" to be "heavily traveled").

 The County, on the other hand, provided no expert opinion to challenge that
of Mr. Conroy. *Leonard Decl.* ¶¶ 3-4, Dkt. 31-10 at 3. Instead, the County argues
here that lay testimony about the existence of a coverage gap creates a genuine
question of material fact. Dkt. 34 at 9-12. Not so. Several courts have concluded
that lay testimony from a small number of individuals is inadequate to create a

---

342 F.3d 818, 833 (7th Cir. 2003); *APT Pittsburgh Ltd. P'ship*, 196 F.3d at 475; *Airtouch
Cellular*, 83 F. Supp. 2d at 1164.

genuine issue of material fact as to the existence of a coverage gap where technical evidence shows that such a gap exists. *See, e.g., Industrial Tower & Wireless, LLC v. Haddad*, 109 F. Supp. 3d 284 (D. Mass. 2015); *Am. Towers, Inc. v. Wilson Cty.*, 2014 WL 28953, at *28 (M.D. Tenn. Jan. 2, 2014).

Even if such lay testimony were not insufficient, in general, to establish a material question of fact here, the particular comments relied on by the County would still fall short of doing so for other reasons. First, several of the commenters raised concerns about a lack of information to support the Wireless Companies' claims regarding a significant gap in coverage. But those questions were later answered by Mr. Conroy and the additional evidence he mustered in support of the existence of such a gap. For instance, one commenter asked whether Verizon's gap in service existed, but Mr. Conroy later provided his analysis of drive test data and propagation maps confirming the coverage gap. R. 1135-36; *Conroy Rpt.* ¶¶ 20-38; Dkt. 31-8 at 15-20.

Second, some commenters claimed there was no lack of coverage in the gap area. For instance, one person looked at maps of coverage online and noted that three major wireless companies appeared to have had coverage in the subject area. Dkt. 32-16 at 32;Dkt. 32-31 at 60-61. But the commenter did not identify which companies these were. Dkt. 32-16 at 32; Dkt. 32-31 at 60-61. Another commenter

noted that the area was already covered by a service carrier other than Verizon or
Inland. Dkt. 32-16 at 36-37; Dkt. 32-31 at 73-74. Still another stated that she
conducted her own drive test and determined that two wireless carriers—neither of
which was Verizon or Inland—covered the area. Dkt. 32-16 at 85-86. The flaw in
each commenter's opinion is that they do not address coverage for the relevant
carriers—Verizon and Inland—despite the fact that a significant gap is established
when a service provider is prevented from filling a gap in *its own* service. *City of
San Diego*, 763 F.3d at 1056. Thus, these comments are not relevant to the
existence of a significant gap.

Third, one commenter noted that Federal Communications Commission
maps showed that Verizon's service covered the area. Dkt. 32-16 at 85-87;
Dkt. 32-31 at 75-77. But Mr. Conroy explained in his reply declaration that such
maps default to outdoor coverage and when the option for in-vehicle coverage is
selected, the map reveals a gap in coverage. *Conroy Reply Decl.* ¶¶ 3-10, Dkt at 9-
12. Mr. Conroy added that these maps must be enlarged to show the level of detail
necessary to accurately show coverage in the area and that when not enlarged, the
map can inaccurately show coverage where none exists. *Conroy Reply Decl.* ¶¶ 3-
10, Dkt at 9-12. All told, the County points to no evidence demonstrating a genuine

question of material fact as to whether a significant gap in Verizon and Inland Cellular service exists.

## B.    Least Intrusive Means

To demonstrate that the County's denial of their application was an effective prohibition on wireless service, the Wireless Companies must next show that the proposed location for the tower is the "least intrusive" on "the values that the denial sought to serve." *See City of Anacortes*, 572 F.3d at 995. The "least intrusive means" standard requires that a wireless provider conduct a "meaningful comparison of alternative sites" to identify "the best solution for the community" when selecting the tower location. *See MetroPCS*, 400 F.3d at 734. The location must also be feasible, meaning it must be available for use, physically accessible, served by the necessary utilities, and not unreasonably costly to erect a tower on. *See, e.g. Horizon Tower Ltd., LLC v. Park County*, 2024 WL 4255229, at *2 (D. Wyo. Oct. 4, 2024); *Cellco P'ship v. White Deer Township Zoning Hearing Board*, 74 F.4th 96, 104 (3d Cir. 2023). Once the wireless provider demonstrates its compliance with this requirement, the burden shifts to the local government to show that its rejection of the proposed site is based on the existence of "some potentially available and technologically feasible alternatives" that would address the coverage gap. *City of Anacortes*, 572 F.3d at 998-99.

The Wireless Companies have satisfied this standard. After identifying the significant coverage gap, they considered the characteristics of the landscape and the location of the gap to determine that a tower must be placed near I-90 and have sightlines to that highway. *Weis Decl.* ¶ 12, Dkt. 31-7 at 4. They then considered several alternative potential sites for the tower. One of these was the American Tower Company tower already in existence. The Wireless Companies eventually dismissed this as a viable option because it would not provide sufficient coverage of the gap area for technical reasons. *Turner Decl.* ¶¶ 9-10, Dkt. 31-6 at 4; *Conroy Rpt.* ¶¶ 53-55, Dkt. 31-8 at 24-25; Dkt. 32-17 at 75-79; Dkt. 32-18 at 5, 9, 11. The County no longer seems to contest this determination. *See* Dkt. 34 at 14-15.

The Wireless Companies also considered the Stimpson property as a possible location for the tower. Ultimately, they decided that this property was also untenable, but for different reasons. They determined that using the property was impractical—it lacked the required infrastructure to support the construction and placement of the tower. Specifically, the Wireless Companies noted that this property did not have road access or available sources of electricity and fiber optics. *Weis Decl.* ¶¶ 9-10, Dkt. 31-7 at 4. Moreover, the surrounding property was owned by the Forest Service, which had indicated that it would only "entertain" use of its land for purposes of a wireless tower if all other options were exhausted.

MEMORANDUM DECISION AND ORDER - 37

*Turner Decl.* ¶ 8-10, Dkt. 31-6 at 4, 8-12. In short, the Wireless Companies asserted that the Stimpson site was not a feasible location for the tower.

The County does not contest this reasoning. Instead, it argues that the Wireless Companies rejected the Stimpson site without providing sound technical reasons. Dkt. 34 at 13-15. Because the practical reasons offered by the Wireless Companies are sufficient to rule out the site as a potential location, and because the County does not contest the Wireless Companies assertions regarding the practical challenges posed by this site, the Court concludes this site was meaningfully considered as an alternative to the proposed site.

Additional properties considered by the Wireless Company were owned by the Forest Service. The Wireless Companies eliminated them because the Forest Service had informed the Wireless Companies that it would "entertain proposals for expanded communications facilities outside of designated sites only after improvement and use of existing facilities ha[d] been determined to be infeasible," and that "[a]ll other avenues must be exhausted before a new communications site is considered." *Turner Decl.* ¶ 8-10, Dkt. 31-6 at 4, 8-12. The Wireless Companies argue that the Forest Service properties were not available to them because the private property owner of the proposed site had agreed to lease it to them for the proposed tower. Dkt. 33 at 17.

MEMORANDUM DECISION AND ORDER - 38

The County argues that because it denied the Wireless Companies'
application to place the tower on the proposed site, the Forest Service properties
are now available for use. Dkt. 34 at 15. This argument's flaw is that it is too
speculative. *Anacortes*, 572 F.3d at 998 (rejecting alternatives sites that were "too
speculative"). First, the County merely speculates that the Forest Service would
consider the County's rejection of an otherwise available site located on private
property to constitute the exhaustion of all other avenues. Second, even if the
Forest Service did consider the County's denial of the application to constitute the
exhaustion of all available alternatives, it is also speculative whether the Forest
Service would grant a request to use its property. The Forest Service merely stated
that it would "entertain" a request for such use if all other avenues were exhausted,
not that it would grant such a request. *Turner Decl.* ¶ 8-10, Dkt. 31-6 at 4, 8-12.

Besides, an applicant need not "endure repeated denials by local authorities
until only one feasible alternative remain[s]" to satisfy the least intrusive means
standard. *MetroPCS*, 400 F.3d at 734. Yet that is what the County is advocating
for. Although the Wireless Companies have not had to endure repeated denials of
applications to use different properties, they have had to endure multiple denials of
their application for the proposed site. It has already been denied twice, and
presumably those denials would have to be affirmed here to demonstrate that the

proposed site is unavailable. This would seem to run afoul of the Ninth Circuit's sentiment from MetroPCS. *MetroPCS*, 400 F.3d at 734.

The County, moreover, admits that it has not identified any other feasible alternative site. Dkt. 32 at 15. In sum, the County has not demonstrated the existence of a genuine question of material fact as to whether the Wireless Companies have meaningfully compared alternative sites as needed to satisfy the least intrusive means standard. Because no such question exists as to the existence of a coverage gap either, the Court determines that the County's denial of the Wireless Companies' application constituted an effective prohibition of wireless service. The Court therefore grants the Wireless Companies' summary judgment motion and denies the County's cross-motion for summary judgment. *See* Fed. R. Civ. P. 56(a).

## REMEDY

The Wireless Companies request that the Court issue orders "requiring the Defendants to grant the Application and thereby approve the Proposed Facility" and "directing the Defendants to issue all subsequent and ancillary approvals and permits necessary for the construction of the Proposed Facility." *Compl.* ¶¶ 8-9, Dkt. 1 at 24. Although the Telecommunications Act does not specify a remedy for a permit denial unsupported by substantial evidence or an effective prohibition,

this Court and others have determined that "the appropriate remedy is injunctive relief in the form of an order to issue the relevant permits" because "injunctive relief best serves the Act's stated goal of expediting resolution of this type of action." *Kootenai County*, 2025 WL 563911, at *13; *see, e.g.*, *T-Mobile W. Corp. v. City of Huntington Beach*, 2012 WL 4867775, at *19 (C.D. Cal. Oct. 10, 2012). Therefore, the Court grants injunctive relief as requested to the Wireless Companies.

## ORDER

**IT IS ORDERED that:**

1. Plaintiffs' Motion for Summary Judgment (Dkt. 31) is **GRANTED**.

2. Defendants' Cross-Motion for Summary Judgment (Dkt. 32) is **DENIED**.



DATED: September 4, 2025

B. Lynn Winmill
U.S. District Court Judge